IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs May 20, 2025 in Knoxville

**STATE OF TENNESSEE v. JEREMY TOBIAS RYAN BYRAM**

**Appeal from the Circuit Court for Hardin County**
**No. 21-CR-60      J. Brent Bradberry, Judge**

_____

**No. W2024-00788-CCA-R3-CD**

_____

A Hardin County jury convicted the Defendant of first degree premeditated murder, and the trial court imposed a life sentence in the Tennessee Department of Correction. On appeal the Defendant contends that the evidence is insufficient to sustain his conviction. After review, we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which TIMOTHY L. EASTER and MATTHEW WILSON, JJ., joined.

Jamie L. Davis (on appeal), Adamsville, Tennessee, and Marcus A. Lipham and Moriah L. McCallister (at trial), Jackson, Tennessee, for the appellant, Jeremy Tobias Ryan Byram.

Jonathan Skrmetti, Attorney General and Reporter; Benjamin L. Barker, Assistant Attorney General; J. Neil Thompson, District Attorney General; and Morgan B. Reynolds and R. Adam Jowers, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts**

This case arises from the Defendant's shooting and killing Brian Diss ("the victim"). The Defendant and his girlfriend, Jeanna Chacon, rented a cabin "off the grid" in a rural area of Hardin County, Tennessee, for a month. They became acquainted with their neighbors and, on October 7, 2020, attended a cookout at the victim's cabin. Later in the evening, after Ms. Chacon and her three children left, the victim hit the Defendant with a hammer to prevent the Defendant from putting out the campfire. The Defendant drove to his cabin and told Ms. Chacon that the victim had hit him with a hammer. He told her to

pack up their belongings because they were leaving. After also speaking with another neighbor, Lee Holland, about the incident, the Defendant returned to the victim's cabin and shot him three times with a shotgun. The Defendant then fled the state. A Hardin County grand jury indicted the Defendant for the first degree premeditated murder of the victim.

At trial, the parties presented the following evidence: Heather Simmons was the victim's friend and neighbor. At around 5:30 p.m. on October 7, 2020, Ms. Simmons, Charles Manuel, and Sandra Bonee walked to the victim's cabin. Ms. Simmons noticed a red four-wheeler in the driveway and a fire "smoldering." She thought the fire was odd because it was unlike the victim to leave a fire unattended. Ms. Simmons asked Mr. Manuel to put out the fire while she and Ms. Bonee walked to the front door. Ms. Simmons observed that the door jamb to the front door was broken. Ms. Simmons was not concerned by the broken door jamb because the victim was known for losing his keys. She thought the victim had likely lost his keys and had to kick the door open to get inside.

Ms. Simmons pushed the door open, and a putrid smell emanated. Ms. Simmons thought it was likely trash that needed to be taken out. Ms. Simmons did not enter the cabin but looked around and noticed what appeared to be a "pile of blankets on the couch." A cat ran out the front door, and Mr. Manuel suggested that they feed the cat while they were there. Ms. Simmons grabbed the cat food from inside the door, fed the cat, and slid the cat food back inside before shutting the door. Ms. Simmons said that it was growing dark when they were at the cabin and it was in a wooded area without electricity.

Ms. Simmons returned to the victim's cabin on October 8, 2020. When she did not find the victim at home, she went to Mr. Holland's residence. Mr. Holland had not seen the victim. Ms. Simmons wondered if the victim might be "hanging out" at the Defendant's cabin. Later that day, after Ms. Simmons got off work at 2:00 p.m., she and Mr. Holland went to the victim's cabin together. Mr. Holland went inside the cabin while Ms. Simmons checked on a walking path through the woods that she considered "treacherous" to see if the victim had fallen. She did not make it far before Mr. Holland called out for her. He told her the victim was dead, and they needed to leave. Ms. Simmons called 911 and waited for law enforcement to arrive.

Lee Holland, the victim's friend and neighbor, lived "by TVA Road out towards Clifton." Mr. Holland explained that the Defendant lived about halfway between the victim and Mr. Holland. Mr. Holland had not seen the victim for a couple of days, so he joined Ms. Simmons to check on the victim at his cabin. When he approached the cabin, he saw that "the door was busted." Four days earlier, when Mr. Holland had last been at the cabin, the door had not been broken. Mr. Holland stepped inside the cabin, and, to the right, he saw the victim, dead, on the couch. Mr. Holland recalled that the victim's eyes were closed; there was blood on the victim's chest, and blood pooled on the floor under the couch.

2

The State asked Mr. Holland about the last time he had seen the Defendant, and he said that he had last seen him at about 1:30 a.m. on October 7. The Defendant had knocked on Mr. Holland's door. Mr. Holland stepped out on the unlit porch and saw that the Defendant had a bloody rag on his hand. Mr. Holland smelled alcohol on the Defendant, and the Defendant said, "[the victim] hit [me] on the head with a f**king hammer." When Mr. Holland questioned what the Defendant had said, the Defendant repeated, "[the victim] hit me on the head with a f**king hammer, and I'm going to kill him." Mr. Holland asked the Defendant if the blood on the rag was from the Defendant's head, and the Defendant said that the blood was not from his head, it was from his hand. Mr. Holland did not see any blood or injury to the Defendant's head.

Mr. Holland believed the Defendant to be drunk, noting that the Defendant's speech was repetitive. The Defendant kept saying he was going to kill the victim. Mr. Holland recalled that after "a minute" the Defendant appeared to calm down. Mr. Holland asked the Defendant if he needed medical help, and the Defendant declined. Mr. Holland did not call 911, believing that the Defendant's statements were drunken empty threats, and the Defendant did not ask Mr. Holland to call 911.

The next day, as Mr. Holland and his wife were leaving, they passed the Defendant's cabin. Mr. Holland noticed items sitting outside as if the Defendant "left in a hurry." This caused Mr. Holland to question whether the Defendant had followed through with his drunken threats. Next, they drove past the victim's cabin and Mr. Holland saw the owner of the property the victim lived on, Jeremy Mann, standing by a fire in front of the victim's cabin. Seeing Mr. Mann there eased Mr. Holland's concern about the victim's safety. Mr. Holland stated that he did not think about the Defendant's threats again until Ms. Simmons came to his home looking for the victim on October 8, 2020.

Hardin County Sheriff's Deputy John Terry responded to Ms. Simmons's 911 call at around 2:30 p.m. When Deputy Terry arrived, the door to the cabin was open. He went inside and saw the victim on the couch partially covered with a red blanket. He observed "severe wounds to [the victim's] left shoulder and his neck or throat area." Deputy Terry looked around for weapons and found only a shell casing on the floor. Deputy Terry exited the cabin and secured the scene. Present at the scene were Ms. Simmons and Mr. Holland, both of whom provided written statements. Two other neighbors arrived on the scene, Jeremy Mann and Michael Burke. Deputy Terry took statements from these men as well.

Tennessee Bureau of Investigation ("TBI") Agent Kenneth Rippy worked with Hardin County Sheriff's Department Deputy Jeremy Hill to gather evidence at the crime scene. Agent Rippy identified twenty-four photographs of the crime scene. Agent Rippy described a 12 x 12, one-bedroom, "shack" located on the property with a fire-pit outside.

3

Agent Rippy observed that the doorknob and deadbolt on the front door were missing. Additionally, the door frame was broken as though the door had been forced open. Once inside, Agent Rippy saw the victim lying on the couch. He found "wadding from a shotgun" on the right side of the victim's chest and on the floor. After the victim's body was moved, law enforcement found a shot pellet from a shotgun round.

Law enforcement officers found a hole on the seat portion of the couch where the victim was lying and one on the back of the couch. Officers moved the couch away from the wall, and found, on the exterior of the wall below a hole, insulation and wadding from a shotgun. Agent Rippy found three hammers at the crime scene: one outside the residence and two inside the residence. None of the hammers appeared to have any evidence related to the crime. In the front yard, Agent Rippy found an unfired 12-gauge cartridge.

TBI Special Agent Brent Booth was the lead investigator in this case and responded to the "Swift community" in the northern part of Hardin County, arriving after 2:00 a.m. on October 8, 2020. Special Agent Booth said that this area was "off the grid" with no electricity, "very little" water service, and no cell service. The housing in this area consisted of utility buildings, tents, and "plywood-type" cabins. A gravel road led to the victim's cabin. The property was cluttered with building materials. Special Agent Booth went inside the cabin and saw the victim's body, partially covered with a blanket, lying on the couch. He noticed a shotgun wound to the left shoulder area and the victim's neck. He said that the victim's body was "in a state of decay."

Law enforcement took written statements from neighbors. The information gathered included that the Defendant had told a neighbor that he intended to kill the victim. The property owner or manager, Mr. Mann, provided law enforcement with a receipt for rent of a cabin that had the Defendant's name and a phone number. Mr. Mann also indicated that the Defendant, Ms. Chacon, and the children had left in a hurry, leaving items behind. Special Agent Booth assigned Agent Rippy to process the scene while he worked with Special Agent Parson on tracking the Defendant's phone with the number Mr. Mann provided.

Special Agent Booth obtained and executed a search warrant on the Defendant's residence. He described the residence as a utility building with no water or electricity on a dirt road. Special Agent Booth found the residence in "disarray," with clothing and personal items lying around. It appeared that the occupants had abruptly left the premises based upon the items left behind. Law enforcement found one black Remington 12-gauge shotgun shell "laid up on the top, two by four top frame of the wall of that house."

On cross-examination, Special Agent Booth agreed that TBI analysis revealed that a comparison of the "wads" or "shot cups" found on and around the victim's body were

4

not consistent with the "wads" present in the shot shell collected at the Defendant's residence. He clarified, however, that the "wads" collected at the crime scene were consistent with a 12-gauge round. Special Agent Booth noted that although law enforcement found four "waddings" in the residence there were no shell casings, indicating that the shell casings had been removed.

TBI Special Agent Michael Parson assisted Special Agent Booth in investigating this case. Special Agent Parson obtained a receipt with the Defendant's name and phone number on it. With that information, he communicated with the phone company to track the cell phone's location. Law enforcement was able to track the Defendant's cell phone through Kentucky to Illinois. Special Agent Parson contacted Illinois State Police detectives for assistance. Special Agent Parson drove to the area of the "phone's last ping." It was a rural area that Special Agent Parson described as "a campground for transients." The Illinois authorities found the Defendant and arrested him. At the time of the arrest, Ms. Chacon and several young children were with the Defendant.

Illinois law enforcement obtained a search warrant and executed the warrant on the Defendant's vehicles, a Ford Explorer and a minivan. Inside the Ford Explorer, Illinois State police found a shotgun and a long rifle. Blood was found on the shotgun's foregrip. Law enforcement took swabs of the blood, and testing showed the blood matched the Defendant's DNA. The Defendant and Ms. Chacon were transported to the police station where Ms. Chacon gave a statement to the police. In the booking room, Special Agent Parson had the opportunity to observe the Defendant and saw no injuries to his hand or his head. The Defendant refused to give a statement, refused treatment, and refused to let anyone look him over for possible injuries. Further, once the Defendant was transported to Hardin County, during intake at the jail, he reported no injuries or need for medical treatment.

Ms. Chacon, the Defendant's girlfriend, was charged in this case with accessory after the fact. She testified at trial that the State had not offered "any promises in exchange for [her] testimony." Ms. Chacon and the Defendant met in Abilene, Texas, and began dating in 2017. The couple moved to Hardin County, Tennessee, in September 2020 with Ms. Chacon's three children.

Ms. Chacon testified that they lived about a half a mile from the victim, and she had known the victim for about a month at the time of his death. On the afternoon of October 6, 2020, the Defendant, Ms. Chacon, and her children went to the victim's cabin for a cookout. At some point, after it had grown dark, Ms. Chacon asked the Defendant to drive her and her children home so she could put the children to bed. The Defendant drove Ms. Chacon and the children home and then returned to the victim's cabin to "finish a bottle of whiskey that they were drinking." Ms. Chacon went to sleep.

Later, the Defendant woke up Ms. Chacon, telling her that he had been hit on the head with a hammer. Ms. Chacon described the Defendant as panicked and in shock. She could not differentiate between the Defendant's shock over being hit in the head with a hammer and any level of intoxication he may have been experiencing. The Defendant instructed Ms. Chacon to "pack up and leave." Ms. Chacon packed up and got in the car with her children. The Defendant then went to Mr. Holland's house. When he returned, he told Ms. Chacon that he needed to call his mother. Ms. Chacon drove her Honda Odyssey, and the Defendant drove a Ford Explorer to the logging road where they could get cell service. The Defendant was unable to reach his mother, so he tried to call his brother. Ms. Chacon believed that the Defendant was trying to reach his family "[t]o get talked out of doing something."

At some point, Ms. Chacon decided to return to their cabin because she had left a few items, and the Defendant drove to the victim's house to "look for his glasses." After retrieving the items, Ms. Chacon met the Defendant on the road as he was leaving the victim's cabin, and she followed him to a Wal-Mart in Savannah. In the parking lot, Ms. Chacon asked the Defendant "what happened," and he said, "he had five shotgun shells, and he only had one left." Ms. Chacon recalled that the Defendant's demeanor was "flat" and emotionless. She said that he did not appear to be intoxicated. The Defendant and Ms. Chacon then drove to a gas station to get gas and to buy cigarettes. The Defendant then returned to the victim's house once again "looking for his firearm or he was looking for something." Ms. Chacon continued driving, and she and the Defendant met up "in a different town." He told Ms. Chacon that "he got the shells and then [the victim]'s phone" and threw them out the window of his vehicle as he drove.

The Defendant and Ms. Chacon drove to Land Between the Lakes and stayed for one night before proceeding to a free campsite in Illinois. Ms. Chacon testified that she saw a "very deep wound" on the Defendant's head with "a squishy part." She also described a cut to the Defendant's middle finger. Ms. Chacon photographed the Defendant's injuries with her cell phone, but the Defendant never stopped for medical treatment or to buy any "medication" for his head. Ms. Chacon did not attempt at any time to call 911 nor did the Defendant.

Ms. Chacon testified that the Defendant owned two guns that he kept by the cabin door. The two guns were a shotgun and "an AR." Ms. Chacon testified that the Defendant told her that he wanted to return to the victim's house to kill the victim because the victim hit him with a hammer.

During the pendency of the case, Hardin County Sheriff's Deputy Caleb Sanders transported the Defendant from Riverbend Maximum Security Prison in Nashville,

6

Tennessee, to Hardin County for a court hearing. It was Deputy Sanders's first day with the Sheriff's Office, and he was unfamiliar with the Defendant's case or why the Defendant was going to court. As Deputy Sanders drove, the Defendant told Deputy Sanders about his case. The Defendant said that he was living "off the grid" in an area outside Savannah in Hardin County. One night he and the victim were at a campfire. At some point the Defendant prepared to put out the fire. The victim became angry about the Defendant's putting out the fire, and he hit the Defendant on the head with a hammer. The Defendant put his hand to his head, and the victim hit the Defendant's hand with the hammer, splitting open his hand. The Defendant left the area to get away from the victim and drove to the home of the man who owned the land where the victim lived. The Defendant asked the landowner to call the police, but the landowner refused and told the Defendant to leave.

Deputy Sanders recalled that the Defendant told him that he returned to the campsite, got a shotgun, and shot the victim twice. The Defendant did not indicate from where he got the shotgun. The Defendant told Deputy Sanders that he knew he had hit the victim when he saw the victim on the ground moaning. Deputy Sanders and the Defendant then began talking about other things as they drove. Later, as they were driving down Highway 128 toward Savannah, the Defendant pointed out the window and said, "that's where it happened." Deputy Sanders asked, "what happened?" And the Defendant responded, "that's where I shot that guy." Deputy Sanders confirmed that the Defendant made that comment "close to TVA Road."

Dr. Danielle Harrell worked as an assistant medical examiner at the West Tennessee Regional Forensic Center in Memphis, Tennessee. Dr. Harrell did not perform an autopsy on the victim's body, but she had reviewed the records and agreed with the conclusions. The victim sustained multiple shotgun wounds. One shotgun wound was on the victim's left shoulder area; another was on the left side of the victim's neck, and a third shotgun wound was to the "lower aspect of the [victim's] abdomen." The abdominal wound caused injury to two major vessels in the body: the common iliac vein and the femoral artery. Dr. Harrell testified that the cause of death was significant vascular injuries due to multiple gunshot wounds, and the manner of death was homicide.

After hearing this evidence, the jury convicted the Defendant of first degree premeditated murder, and the trial court imposed a life sentence. It is from this judgment that the Defendant appeals.

## II. Analysis

The Defendant asserts that the evidence is insufficient to support his conviction because he was not "sufficiently free from excitement and passion as to be capable of

premeditation."  The State responds that the jury rejected this theory and, therefore, this court should affirm.  We agree with the State.

When an accused challenges the sufficiency of the evidence, this court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)).  This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence.  *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)).  In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence.  *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973).  "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'"  *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)).  "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'"  *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence.  *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).  Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence.  *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)).  "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact."  *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997).  "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State."  *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973).  The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation.  The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand.  Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses.  In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This Court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000) (citations omitted).

First degree murder is defined as a "premeditated and intentional killing of another." T.C.A. § 39-13-202(a)(1) (2018). Premeditation refers to "an act done after the exercise of reflection and judgment." T.C.A. § 39-13-202(d) (2018). Whether the defendant premeditated the killing is for the jury to decide, and the jury may look at the circumstances of the killing to decide that issue. *Bland*, 958 S.W.2d at 660. The Tennessee Code states that, while "the intent to kill must have been formed prior to the act itself," that purpose need not "pre-exist in the mind of the accused for any definite period of time" for a defendant to have premeditated the killing. T.C.A. § 39-13-202(d) (2018).

The following factors have been accepted as actions that demonstrate the existence of premeditation: the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, declarations by the defendant of an intent to kill, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, and calmness immediately after the killing. *Bland*, 958 S.W.2d at 660. In addition, a jury may consider destruction or secretion of evidence of the murder and "the planning activities by the appellant prior to the killing, the appellant's prior relationship with the victim, and the nature of the killing." *State v. Nichols*, 24 S.W.3d 297, 302 (Tenn. 2000); *State v. Halake*, 102 S.W.3d 661, 668 (Tenn. Crim. App. 2001) (citing *State v. Gentry*, 881 S.W.2d 1, 4-5 (Tenn. Crim. App. 1993)). Also, "[e]stablishment of a motive for the killing is a factor from which the jury may infer premeditation." *State v. Leach*, 148 S.W.3d 42, 54 (Tenn. 2004).

The evidence, considered in the light most favorable to the State, showed that the Defendant and the victim were drinking around a campfire. The victim hit the Defendant with a hammer, and the Defendant left the victim's premises. The Defendant drove to his cabin, woke Ms. Chacon, and told her about the incident and that he wanted to kill the victim. He told Ms. Chacon to pack up their belongings, they were leaving. The Defendant then drove to Mr. Holland's residence and told Mr. Holland that the victim had hit him with a hammer and that he wanted to kill the victim. The Defendant returned to his cabin and told Ms. Chacon that he wanted to speak with a family member "to get talked out of

doing something." In separate cars, Ms. Chacon and the Defendant drove to a nearby logging road where he could get cell service. Unable to reach his family, the Defendant drove to the victim's residence "to get his glasses."

Following this trip to the victim's cabin, the Defendant told Ms. Chacon that "he had five shotgun shells, and he only had one left." The Defendant's demeanor was "flat" and "emotionless," and he did not appear to be intoxicated at this point. The Defendant returned one final time to the victim's cabin to retrieve the shotgun shells and the victim's phone. The Defendant told Ms. Chacon that he had thrown those items from his vehicle as he drove. The Defendant and Ms. Chacon fled the state to a free campground in Illinois where they were apprehended. The victim was shot with a 12-gauge shotgun, and a 12-gauge shotgun was retrieved from the Defendant's vehicle in Illinois. The shotgun's foregrip had blood on it that matched the Defendant's DNA.

The Defendant contends that his head injury and drunken state prevented him from forming premeditation. There are multiple factors that support the jury's finding of premeditation. The Defendant was angry that the victim had assaulted him with a hammer. Time elapsed between the alleged assault and the shooting. The Defendant told both Ms. Chacon and Mr. Holland of his intent to kill the victim. Additional time passed while the Defendant tried to contact his family to talk "him out of doing something." The Defendant used a shotgun to shoot the unarmed victim. Following the shooting, the Defendant's demeanor was flat, and he did not appear to be intoxicated. The Defendant returned to the victim's cabin for the third time that evening to retrieve and destroy evidence that could link him to the shooting. He then fled the scene. The jury heard the testimony that the Defendant smelled of alcohol and had been hit with a hammer. By its verdict, the jury rejected the Defendant's theory that those factors precluded the Defendant from acting with premeditation when he shot the victim three times.

Accordingly, we conclude that the evidence supports the jury's finding that the Defendant acted with premeditation when he drove to the victim's cabin and shot and killed him. The Defendant is not entitled to relief.

### III. Conclusion

Based on the foregoing law and reasoning, the trial court's judgment is affirmed.


_____s/ _ROBERT W. WEDEMEYER__
ROBERT W. WEDEMEYER, JUDGE